**UNITED STATES of America, Appellee,**

v.

**Irving NORTH.**

**Appeal of William D. EYLER, an immunized witness in the case of United States v. North.**

No. 79–2352.

United States Court of Appeals, Third Circuit.

Argued Oct. 16, 1979.

Reargued En Banc April 28, 1980.

Decided May 22, 1980.

Russell J. Ober, Jr. (argued), Wallace, Chapas & Ober, Pittsburgh, Pa., for appellant.

Robert J. Cindrich, U. S. Atty., Edward J. Schwabenland, Asst. U. S. Atty. (argued), Pittsburgh, Pa., for appellee.

Argued Oct. 16, 1979.

Before SEITZ, Chief Judge, and GARTH and SLOVITER, Circuit Judges.

Reargued April 28, 1980.

Before SEITZ, Chief Judge, and ALDISERT, ADAMS, GIBBONS, ROSENN, WEIS, GARTH, HIGGINBOTHAM and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge.

This appeal requires us to ascertain the nature, and therefore the consequences of a contempt sentence imposed upon William Eyler, who, having been immunized, thereafter refused to testify at the trial of Irving North, when he (Eyler) was called by the Government. Eyler now appeals the denial of his motion to reduce the term of the six-month contempt sentence imposed upon him. It is Eyler's contention that his contempt was civil in nature and must therefore be governed by 28 U.S.C. § 1826.[1]

---

1. 28 U.S.C. § 1826 provides in relevant part that recalcitrant witnesses may be held in civil contempt:

> (a) Whenever a witness in any proceeding before or ancillary to any court or grand jury of the United States refuses without just cause shown to comply with an order of the court to testify . . ., the court, upon such refusal . . ., may summarily order his confinement at a suitable place until such

Thus, he argues that he must be released, since the proceeding at which he was sentenced has ended. We conclude however, that Eyler was held in criminal contempt, to which 28 U.S.C. § 1826 has no application, and accordingly we affirm the district court's refusal to modify Eyler's six-month contempt sentence.

## I.

Eyler's appeal arises out of events that transpired during the course of the trial in *United States v. North*, Crim. No. 79–98 (W.D.Pa.), a case in which defendant North was charged in a complex bank fraud scheme. Jury trial of North commenced on July 10, 1979.

Eyler was one of the co-conspirators named in the North indictment and charged in a companion indictment. Eyler had pled guilty to a number of counts and had agreed to cooperate with the Government at North's trial. On November 8, 1978, Eyler had been sentenced on this plea, and was serving concurrent three-and-one-half-year and four-year sentences, when subpoenaed to testify against North.

On July 12, 1979, Eyler was called by the Government to testify at North's trial. Eyler refused to testify, invoking his fifth amendment privilege against self-incrimination. On that same date, Eyler was granted use immunity under 18 U.S.C. §§ 6002 and 6003 and was then ordered to testify.[2] He was advised by the court at this time that should he still refuse to testify he would be held in contempt. He was also told by an Assistant United States Attorney that he could purge himself of this contempt by testifying thereafter.

The next day, on July 13, 1979, Eyler again refused to testify. Twice the district court judge explained to Eyler that he was compelled to testify and that he would be held in contempt and sentenced if he refused. App. at 22a, 27a. Each time Eyler was told either, that a contempt sentence would interrupt his current criminal sentence, or that it would lengthen his stay in jail. *Id.* at 23a, 27a. Eyler was also informed that he could purge himself of contempt by testifying. *Id.* at 22a. When Eyler persisted in his refusal to testify, he was finally held in contempt and sentenced to six months in jail after again being given an opportunity to purge himself.

North's trial continued without Eyler's testimony and ended four days later on July 17, 1979, when the jury returned guilty verdicts on all counts with which North was charged.[3] Thereupon, on July 23, 1979, Eyler filed a motion for reduction of sentence pursuant to Fed.R.Crim.P. 35, claiming that since North's trial had ended, his contempt sentence—which he claims was for a civil contempt—must also end. On August 21, 1979, this motion was denied by the district court. This appeal followed. After argument before a panel on October 16, 1979, on November 21, 1979 rehearing en banc was ordered by this court. Argument before the court en banc was then heard on April 28, 1980.

## II.

The critical issue in this case is whether Eyler was held in civil contempt or in criminal contempt. It is undisputed that if Eyler was held in civil contempt, *see* 28 U.S.C.

time as the witness is willing to give such testimony . . . .. No period of such confinement shall exceed the life of—
(1) the court proceeding, or
(2) . . . ..
(b) No person confined pursuant to subsection (a) of this section shall be admitted to bail pending the determination of an appeal taken by him from the order for his confinement if it appears that the appeal is frivolous or taken for delay. Any appeal from an order of confinement under this section shall be disposed of as soon as practicable, but not later than thirty days from the filing of such appeal.

2. This proceeding was held before a different judge than the one who was conducting the North trial and who ultimately sentenced Eyler for contempt. 18 U.S.C. § 6002 provides that a witness once immunized may not refuse to testify, and no use may be made of his testimony so given. Exceptions are provided only for perjury prosecutions, the giving of a false statement, or otherwise failing to comply with the court's order. 18 U.S.C. § 6003 specifies the procedure for granting immunity.

3. North has been a fugitive since August 7, 1979, when he failed to appear for sentencing.

§ 1826, *quoted* note 1 *supra*, his sentence must be reduced, but if he was held in criminal contempt, *see* 18 U.S.C. § 401,[4] the district court's refusal to reduce his sentence must be affirmed. Although the district court failed to specify the particular statute under which Eyler's contempt was imposed, or to characterize the contempt as either civil or criminal, a careful examination of the record leading up to, and following, Eyler's contempt sentence is, in our judgment, conclusive. Our scrutiny of the record satisfies us that the district court did not err in refusing to reduce Eyler's sentence to correspond to the length of North's trial.

### A.

On July 12, 1979, when Eyler appeared before district Judge Simmons and was granted immunity, Judge Simmons and the Assistant United States Attorney, at the behest of Eyler's counsel, explained the consequences of refusing to testify after a grant of immunity. The record transcript reveals the following:

> MR. MANNING [Assistant United States Attorney]: Mr. Eyler, should you refuse to testify at this stage of the proceedings, the Government would then present a petition to the Court, the District Court, to have you held in contempt for failure to testify. In fact, that can be done orally. It need not be prepared written. And evidence will be presented to the Court to show that you did fail to testify, at which time the Court could determine that you were in contempt of the order of court and hold you incarcerated for a period of time, at the determination of the court, which would extend whatever sentence you are presently serving and cannot run concurrently thereto. You understand what I'm saying?
>
> MR. EYLER: Yes.

> THE COURT: In other words, in plain English, if you have, say, two more years to serve and you would refuse to testify and you would remain in contempt, say for a year, you would still have two more years to go on your present incarceration.
>
> MR. MANNING: Do you understand?
>
> MR. EYLER: I understand.
>
> MR. MANNING: If you would be held in contempt, that you could purge yourself of that contempt by thereafter—having been held in contempt—thereafter deciding that you will testify. You understand that?
>
> MR. EYLER: No.
>
> MR. MANNING: Well, if you should refuse to testify and you are held in contempt—
>
> MR. EYLER: Right.
>
> MR. MANNING: (continuing)—and you go over to the Allegheny County Jail, or wherever, and your attorney comes back and says, "Your Honor, my client will now testify," then you would no longer be in contempt. You understand?
>
> MR. EYLER: Oh, you don't get me for perjury for wanting to talk afterwards?
>
> MR. MANNING: No.
>
> MR. EYLER: Okay.

App. at 15a–17a.

On the following day, when Eyler again claimed a fifth amendment privilege against testifying, the district court judge who was presiding at North's trial informed Eyler:

> [THE COURT:] . . . [A] Court cannot force you to testify but it can hold you in contempt for failing to testify. Now, if you are held in contempt, the punishment is a sentence of the Court to incarceration and that sentence might be quite severe and it is a sentence to prison.

4. 18 U.S.C. § 401 provides:

> A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—
>
> (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
>
> (2) Misbehavior of any of its officers in their official transactions;
>
> (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

So finding that you have no further Fifth Amendment right, I have no choice here but to order you to testify and if you refuse on the grounds of the Fifth Amendment or any other grounds, to sentence you to some penalty for your contempt.

So if you want any further opportunity to talk to your attorney, you can have it so long as it is a brief time. He is right here in Court. If you do not want this opportunity, I want to know now whether you are going to testify or not.

If you tell me you are not, then I want to make an order that you are in contempt and that I propose to sentence you and then that order continues until you purge yourself of the contempt or until the end of the sentence.

Now, of course, you can purge yourself of the contempt by agreeing to testify and by testifying.

It is my understanding, although I do not know this is on the record, but I have recollection of it because I think I sentenced you, did I not?

THE WITNESS: Yes.

THE COURT: And I think you are in prison now serving two sentences, the sentence here and one concurrently with the sentence in the Southern District of Ohio?

THE WITNESS: Yes, Your Honor.

THE COURT: Or some other district in Ohio. So the effect of the contempt sentence would be to lengthen your prison sentence. Now, do you want to talk to your attorney again?

THE WITNESS: No, Your Honor.

THE COURT: Are you going to testify?

THE WITNESS: No, Your Honor.

THE COURT: All right.

*Id.* at 22a–23a.

Thereafter, a discussion ensued, *id.* at 25a–28a, in which Eyler's counsel stated that any sentence to be imposed by the court in excess of six months would entitle Eyler to a jury trial. Apparently in this connection, Eyler's attorney referred the court to the provisions of 18 U.S.C. § 3691, which provides for a jury trial in certain cases of *criminal* contempt.[5] At that point the court again addressed Eyler:

THE COURT: Mr. Eyler, I want to explain this a little more thoroughly to you. Do you understand that if you persist in your refusal to testify, I am going to find you in contempt? I am going to sentence you.

The sentence will have the effect of interrupting the running of your criminal sentence. The effect of it will be to extend that sentence, to make it longer. Do you understand?

THE WITNESS: Yes, Your Honor.

App. at 27a.

After a brief recess in which Eyler was given a chance to consult with his counsel and to reconsider his position, he once again refused to testify and was sentenced:

THE COURT: Very well. Let the record show that the defendant is held in contempt for refusing to testify after I have directed him to do so under pain of being sentenced for contempt of Court.

He is held in contempt herewith and sentenced to six months in prison. Let the record show defendant is in prison. The six months will interdict the running of his criminal sentence and an order will be made accordingly.

---

5. 18 U.S.C. § 3691 states:

Whenever a contempt charged shall consist in willful disobedience of any lawful writ, process, order, rule, decree, or command of any district court of the United States by doing or omitting any act or thing in violation thereof, and the act or thing done or omitted also constitutes a criminal offense under any Act of Congress, or under the laws of any state in which it was done or omitted, the accused, upon demand therefor, shall be entitled to trial by a jury, which shall conform as near as may be to the practice in other criminal cases.

This section shall not apply to contempts committed in the presence of the court, or so near thereto as to obstruct the administration of justice, nor to contempts committed in disobedience of any lawful writ, process, order, rule, decree, or command entered in any suit or action brought or prosecuted in the name of, or on behalf of, the United States.

All right, gentlemen. If there is nothing else, Mr. Eyler can be taken back wherever he is to go.

MR. OBER [Counsel for Eyler]: May it please—

THE COURT: Now, you can purge yourself of that contempt by *now* testifying; but, persisting in the refusal, we are through with the proceeding and we are ready to proceed with the trial.

App. at 28a (emphasis supplied).[6]

The court's minute (docket entry number 22) reflects these circumstances in the following language:

Witness William D. Eyler takes witness stand & Takes 5th Amendment & refuses to testify & is held in Contempt & is sentenced to 6 mos. in jail—Jail sentence to interdict the sentence he is already serving.

▮ The formal order signed and entered by the district court (docket entry number 24), reads:

AND NOW, July 13, 1979, following the immunization of the witness, William D. Eyler, and following his refusal to testify in open court this date on the ground that he might incriminate himself and after he had been advised by his attorney fully in the matter under consideration and following his repeated refusal to testify, although ordered to do so.

It is now found that William D. Eyler is in contempt of the court's order and the defendant accordingly is sentenced to imprisonment for a period of six months.

In view of the fact that the witness, William D. Eyler, is now incarcerated, serving two sentences, a term of 3½ years imposed at Criminal No. 78–157, in the Western District of Pennsylvania on November 7, 1978, to run concurrently with the sentence imposed in the Northern District of Ohio at Criminal No. 78–12Y on August 3, 1978, the sentences shall be adjusted accordingly.[7]

After sentence had been imposed, the transcript discloses that other discussions among counsel and the court took place, but these discussions had reference to matters pertaining to North's trial and not to Eyler's contempt. At the conclusion of these proceedings, Eyler's counsel again addressed the court as follows:

MR. OBER: Your Honor, could I just ask one question in connection with Mr. Eyler's status? Now, will he be incarcerated locally during the six month period or will he be returned to Morgantown?

THE COURT: My intention is to return him to wherever he is.

---

**6.** The fact that the district court in imposing sentence provided that the six-month contempt sentence would interdict Eyler's prior sentences is consistent with the service of a criminal contempt sentence in this case. Although the device of interdiction has been generally referred to and employed in civil contempt cases, *see, e. g., In re Grand Jury Investigation (Hartzell)*, 542 F.2d 166, 169 (3d Cir. 1976), *cert. denied*, 429 U.S. 1047, 97 S.Ct. 755, 50 L.Ed.2d 762 (1977), we perceive no practical difference in terms of Eyler's time to be served, between "breaking into" his prior sentences and adding six months to the end of those sentences.

**7.** Eyler raised no issue as to satisfaction of Fed.R.Crim.P. 42(a) at the time of initial briefing. It was not until a supplemental en banc briefing that Eyler referred to that rule, alleging noncompliance and claiming that the failure to cite the rule by the district court indicated that the contempt was civil rather than criminal. However, Eyler did not address or refer us to the order of the district court dated July 13, 1979 (docket entry number 24), which fully satisfies the requirements of rule 42(a). Rule 42(a) reads:

A criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court. The order of contempt shall recite the facts and shall be signed by the judge and entered of record.

We note that the requirement that the facts be stated specifically is fundamental because "[a] criminal contempt order like any other conviction of crime must stand or fall on the sufficiency of the specification of wrongdoing upon which it is based," *Tauber v. Gordon*, 350 F.2d 843, 845 n.1 (3d Cir. 1965) (en banc) (per curiam). While rule 42(a) does not by its terms require a characterization of the contempt, it is evident that issues such as the instant one can be avoided if the order of contempt specifies whether it is a civil contempt or a criminal contempt. *See infra* at 1265. Moreover, because of the seemingly mandatory language of rule 42(a), the district courts should observe its terms strictly.

MR. OBER: Fine.

THE COURT: I did not realize he was in Morgantown but my intention is he will go back there.

MR. OBER: All right, fine.

THE COURT: The only effect of this contempt sentence will be that his sentence will be lengthened accordingly.

App. at 38a–39a.

■ We have deliberately set forth at length the record references to dispel any concern that Eyler's contempt sentence could conceivably have been construed as a civil contempt to be measured by the length of North's trial. First, we observe that had the contempt been intended as a civil contempt, there would have been no need to consider the question of jury trial, an issue raised by Eyler's counsel and which is required only in the case of a criminal contempt, *Cheff v. Schnackenburg*, 384 U.S. 373, 379–80, 86 S.Ct. 1523, 1525–1526, 16 L.Ed.2d 629 (1966); *United States v. Liddy*, 510 F.2d 669, 676 n.29 (D.C.Cir. 1974) (en banc), *cert. denied*, 420 U.S. 980, 95 S.Ct. 1408, 43 L.Ed.2d 661 (1975); *United States v. Boe*, 491 F.2d 970, 971 (8th Cir. 1974). *See United States v. DiMauro*, 441 F.2d 428, 432 (8th Cir. 1971) (jury trial "is obviously the mark of a criminal contempt conviction").[8]

Second, it is apparent from a fair reading of the district court's advice to Eyler, that the district judge intended that Eyler's sentence, once imposed, was to become an unconditional six-month sentence with no further opportunity for curing his contumacy

unless he did so immediately. It is significant to us that immediately upon imposing sentence the court told Eyler:

> Now, you can purge yourself of that contempt by *now* testifying; but, persisting in the refusal, we are through with the proceeding and we are ready to proceed with the trial.

App. at 28a (emphasis supplied). Thus, the district court judge gave Eyler this one last chance to purge himself, providing he did so *at that time*.[9] Eyler refused, thereupon activating the unconditional six-month sentence that had been decreed. The court minutes and the commitment order signed by the district court judge are completely consistent with that action.

Third, at the conclusion of the contempt proceeding, and in response to counsel's inquiry as to whether Eyler was to be incarcerated locally for the six months of his sentence, or whether he was to be returned to Morgantown, West Virginia, where he was serving his prior sentences, the court ordered Eyler back to Morgantown. It is evident to us that if it was still contemplated at that time (July 13, 1979) that Eyler could purge himself by testifying at any time thereafter, there would have been no reason to return Eyler to West Virginia rather than holding him in local custody. While we obviously do not regard Eyler's return to Morgantown as a determinative factor in assessing the nature of the contempt imposed, it does constitute still another indication that the district court in-

---

8. Although it is clear from the second paragraph of 18 U.S.C. § 3691, *quoted* note 5 *supra*, that that statute of itself would not be the source of any jury trial right in the instant case, we deem it probative of the intent of the court and of counsel's recognition of the nature of the contempt being considered, that reference was made to a criminal contempt statute and to the concept of a jury trial in that context.

9. In *Shillitani v. United States*, 384 U.S. 364, 371 n.9, 86 S.Ct. 1531, 1536, n.9, 16 L.Ed.2d 622 (1966), the Supreme Court noted that "the trial judge [must] first consider the feasibility of coercing testimony through the imposition of civil contempt. The judge should resort to criminal sanctions only after he determines, for good reason, that the civil remedy would be

inappropriate." *DiMauro* added the requirements that "the trial judge *expressly* consider the imposition of civil contempt and that the record reveal that the civil alternative was considered and rejected." 441 F.2d at 435 (emphasis supplied). This Circuit has not subscribed to the latter rule. However, we observe that the one last chance given to Eyler to purge himself, before criminal contempt was imposed, more than satisfies *Shillitani* and would have satisfied *DiMauro* as well. In any event, the Supreme Court has noted that the *Shillitani* admonition carries little weight where, as here, the contemnor is already incarcerated and is therefore unlikely to respond to a threat of summary civil contempt. *United States v. Wilson*, 421 U.S. 309, 317 n.9, 95 S.Ct. 1802, 1807, n.9, 44·L.Ed.2d 186 (1975).

tended to, and did, regard the contempt sentence as being criminal in nature.

### B.

The actions by the district court judge taken *after* the trial had concluded, buttress our conclusion.[10] In his motion for correction of sentence, App. at 41a–43a, Eyler, with no record basis for the assertion, claimed that his incarceration had been directed pursuant to 28 U.S.C. § 1826, and that he therefore should have been released from confinement when North's trial ended. Eyler's motion was denied. Obviously, the district court was familiar with the provisions of section 1826, if for no other reason than its quotation in Eyler's motion. It is therefore not difficult for us to conclude that had the district court intended that the contempt imposed upon Eyler be imposed as a civil contempt rather than a criminal contempt, he undoubtedly would have corrected Eyler's sentence pursuant to that statute's requirements.

Moreover, on the same day on which the district court judge refused to change Eyler's sentence, the district court responded to a letter written by the warden of the Morgantown penitentiary, where Eyler was imprisoned. The warden, obviously having received the July 13, 1979 order, *see supra* at 1260, sought clarification of that portion of the order which provided that Eyler's "sentences [three and one-half years and four years concurrent] shall be adjusted accordingly" to provide for the six-month contempt sentence. The district court judge answered the warden's inquiry and, in so doing, in large part answered the question posed by this appeal, by directing the entry of an order which reads:

**10.** *Cf. United States v. Hughey,* 571 F.2d 111, 114–16 (2d Cir. 1978) (circumstances surrounding imposition of contempt sentence, including later actions taken by district judge, relevant in determining nature of contempt). In *Hughey,* in an attempt to erect a double jeopardy bar to a subsequent prosecution, the contemnor argued that he had once been sentenced for criminal contempt. The Second Circuit, however, noted, *inter alia,* that the district judge had released the contemnor when the trial ended,

AND NOW, August 21, 1979, letter dated August 14, 1979, having been received from the Warden at the Federal Correctional Institution at Morgantown, West Virginia, asking for clarification of our order of July 13, 1979,

NOW THEREFORE, the order is clarified. It means that the sentences William D. Eyler is now serving shall be interrupted for a period of six months from the date of the order while he serves the contempt sentence imposed by the order of July 13, 1979.

### III.

The Supreme Court has taught us that the controlling factor in distinguishing between civil contempt and criminal contempt is the *purpose* for which the sentence is imposed. *Shillitani v. United States,* 384 U.S. 364, 368–70, 86 S.Ct. 1531, 1534–35, 16 L.Ed.2d 622 (1966); *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 441, 31 S.Ct. 492, 498, 55 L.Ed. 797 (1911). A sentence imposed to coerce action, such as a witness' testimony, is generally held to follow from a civil contempt; one imposed to punish, is generally held to follow from a contempt which is criminal in nature.

The record in this case discloses that the district court imposed a contempt sentence upon Eyler for two reasons. First and foremost, Eyler, having been immunized, was being punished for his contumacious, unexplained refusal to testify. The Government believed that Eyler's testimony was essential to its case[11] and therefore had sought, and had been granted, immunity for Eyler. Indeed, Eyler's counsel admitted at oral argument before us that the district court could legally have imposed a sentence of criminal contempt here, and would be considered to have done so had the record revealed such an unequivocal statement.[12]

and found that the contempt had been civil in nature.

**11.** The fact that North was convicted without it is, of course, irrelevant.

**12.** *Cf. United States v. Wilson,* 421 U.S. 309, 95 S.Ct. 1802, 44 L.Ed.2d 186 (1975) (unconditional contempt sentence) (contumacious refusal to testify justifies summarily imposed criminal contempt sentence).

Nor are we troubled by the allocution requirement for criminal contempts articulated in

It is just not plausible that the district court, presented with an immunized witness' refusal to testify in the face of three explicit warnings, would have chosen merely to impose a civil contempt sentence whose term would as a practical matter expire within a few days, as measured by the length of North's trial. Such a sentence imposed upon someone in Eyler's situation, would have had virtually no coercive effect. Eyler was already in prison, and was scheduled to remain there for approximately three more years regardless of any sanction resulting from his refusal to testify. Although a civil contempt sentence could add to his total time in prison by interrupting his prior sentences, *In re Grand Jury Investigation (Hartzell)*, 542 F.2d 166, 169 (3d Cir. 1976), *cert. denied*, 429 U.S. 1047, 97 S.Ct. 755, 50 L.Ed.2d 762 (1977), Eyler, as well as the district court judge, had to have recognized that North's trial was almost over. The addition of but another four days to Eyler's prior sentences (the trial ended four days after Eyler's refusal to testify) would be a small price for Eyler to pay for his refusal to comply with the court's order. Thus, we cannot impute the imposition of such a limited, and indeed futile, sanction to the district court. *See United States v. Wilson*, 421 U.S. 309, 317 n.9, 95 S.Ct. 1802, 1807 n.9, 44 L.Ed.2d 186 (1975) (threat of civil contempt is of little use where contemnor is already incarcerated).[13]

It cannot be denied, however, that the district court had as an additional purpose, a desire to secure Eyler's testimony. Accordingly, on at least three occasions, Eyler had been urged to avoid contempt sanctions by testifying. In the face of Eyler's refusal to testify, the district court was finally obliged to enforce its order by an unconditional six-month punishment—*i. e.* a criminal sentence.

Eyler claims that there was still an opportunity for him to cure his contempt as long as North's trial continued; that being so, the contempt was civil in that it was purely coercive, and therefore his sentence could not extend beyond the termination of the North trial, *see* 28 U.S.C. § 1826. The difficulty with this contention is that not only is it unsupported by the record, but as we have pointed out it would lead to a wholly illogical and ineffective result. Having failed in his efforts to obtain Eyler's testimony, the district court, as we have acknowledged, settled for a satisfaction of one of the two purposes leading to Eyler's contempt citation—he punished Eyler by sentencing him unconditionally to a six-month term.

Even if we were less certain than we are that an unconditional sentence was intended and indeed imposed, we would still be persuaded to uphold Eyler's sentence.[14] Although the traditional learning is that generally coercive civil contempts result in conditional sentences which permit the con-

---

*Taylor v. Hayes*, 418 U.S. 488, 496–500, 94 S.Ct. 2697, 2702–2704, 41 L.Ed.2d 897 (1974). That case held that due process required that the contemnor be afforded notice and a hearing where the contempt sentences were imposed summarily *after* trial for conduct *during* trial. In the instant case, sentence was imposed contemporaneously with the contemptuous conduct, and in any event Eyler had repeated warnings of what lay in store for him, repeated opportunities to explain his actions, and repeated chances to avoid punishment and purge himself of contempt at the time his testimony was sought and required by agreeing to testify. The record makes it crystal clear that Eyler knew precisely that if he did not testify he would be held in contempt. At oral argument counsel expressly stated that his client had not been denied allocution and that there was complete awareness of the contempt proceedings.

**13.** We do not mean to imply that civil contempt would never be an appropriate sanction for a witness who is already in jail. For example, if the trial judge believed that the trial would last for a substantial period of time, a coercive sentence of civil contempt that would last either until the witness testified or until the trial ended might well be considered.

**14.** We have no occasion here to pass upon the effect of any ambiguity that may have been created in Eyler's mind. We think it was quite clear to Eyler that he was facing an extra six months in jail should he refuse to testify, and since North's trial ended without Eyler's testimony, Eyler may not now claim that he was prejudiced by an unconditional six-month sentence which he now claims to have thought was still conditional.

temnor to relieve himself from all sanctions through compliance, and that generally punitive criminal contempts do not contemplate such self-relief, but rather result in unconditional immutable jail terms, *see, e.g., Shillitani,* 384 U.S. at 368–70, 86 S.Ct. at 1534–35; *Skinner v. White,* 505 F.2d 685, 689 (5th Cir. 1974); *Liddy,* 510 F.2d at 675–76, a sentence which combines both elements has nonetheless been imposed and approved. Such a "hybrid" criminal contempt sentence was imposed in *In re Reina,* 170 F.Supp. 592 (S.D.N.Y.), *aff'd sub nom. United States v. Reina,* 273 F.2d 234 (2d Cir. 1959) (per curiam), *aff'd,* 364 U.S. 507, 81 S.Ct. 260, 5 L.Ed.2d 249 (1960). The Second Circuit did not discuss this aspect of the case. The Supreme Court, while apparently finding no fault with such a sentence, explicitly declined to reach that issue, 364 U.S. at 515, 81 S.Ct. at 265, despite Justice Black's dissent, *id.,* as it had not been raised. Reference was thereafter made to this type of sentence in *Liddy,* 510 F.2d at 676 n.29:

> When confronted with a contumacious grand jury witness who was already imprisoned, the District Court in *In re Reina,* 170 F.Supp. 592 (S.D.N.Y.1959), sentenced the contemnor to two years' imprisonment to commence at the expiration of the sentence he was serving but allowed him 60 days from the date of judgment to purge himself of the contempt, in which case the two-year sentence would be vacated. Both the Second Circuit, 273 F.2d 234 (1959), and the Supreme Court, *Reina v. United States,* 364 U.S. 507, 81 S.Ct. 260, 5 L.Ed.2d 249

(1960), affirmed the contempt conviction and impliedly approved the District Court's "hybrid" sentencing technique. However, this technique was cast in doubt by the following comment by the Court in *Shillitani v. United States,* 384 U.S. 364, 370 n. 6, 86 S.Ct. 1531, 1536, [16 L.Ed.2d 622] (1966):

> The court may also impose a determinate sentence which includes a purge clause. This type of sentence would benefit an incorrigible witness. It raises none of the problems surrounding a judicial command that unless the witness testifies within a specified time he will be imprisoned for a term of years. See *Reina v. United States,* 364 U.S. 507 [81 S.Ct. 260, 5 L.Ed.2d 249] (1960).

The Court did not identify any specific "problems" inherent in the "hybrid" criminal contempt technique of *Reina,* but it may have been alluding to its holding that same day in *Cheff v. Schnackenburg,* 384 U.S. 373, 86 S.Ct. 1523, 16 L.Ed.2d 629 (1966), that a contemnor may not be sentenced to more than six months' imprisonment for criminal contempt without a jury trial.

Thus, even if we were not satisfied that Eyler's sentence was unconditional, Eyler would gain nothing, for at the very least his sentence is no different in substance than the criminal contempt sentence approved in *Reina.*[15] Eyler's sentence, like the hybrid sentence imposed in *Reina,* still would retain a criminal character and thus would not end when the underlying trial concluded.[16] See Kuhns, *The Summary Contempt*

---

**15.** As a matter of interest we observe that whereas Eyler had obstinately flouted the court's order at least three times, Reina had asserted his legal position for not testifying in good faith and was not contumaciously disrespectful of the court's order. 364 U.S. at 514, 81 S.Ct. at 264.

**16.** In *DiMauro,* after sentencing the contemnors unconditionally, the district court informed counsel that if the contemnors testified prior to the discharge of the grand jury or the expiration of the 120-day period for reduction of sentence under Fed.R.Crim.P. 35, the court would take the contemnors' compliance into account in deciding whether to reduce the sentence in response to a rule 35 motion. The

contemnors subsequently all testified and their sentences were thereupon reduced from three years' imprisonment to three years' probation. 441 F.2d at 431. While the *DiMauro* court distinguished that situation from one where an express purge clause is included in the sentence, thereby making the sentence conditional, we perceive little difference between the two. We therefore read *DiMauro* as supporting a "hybrid" contempt sentence. In *Wilson* as well, the Supreme Court approved a criminal contempt sentence where the judge had "made it clear that he would consider reducing the contempt sentences, or eliminating them completely, if respondents decided to testify." 421 U.S. at 312, 95 S.Ct. at 1804.

*Power: A Critique and a New Perspective,* 88 Yale L.J. 39, 113–18 (1978) (suggesting the desirability and propriety of using a determinate contempt sentence with a purge clause in the case of a recalcitrant witness); Note, *Coercive Contempt and the Federal Grand Jury,* 79 Colum.L.Rev. 735, 772 (1979) (same).

■ The need for this court to determine if the sentence imposed on Eyler was intended to be for criminal or civil contempt could easily have been obviated had the district court merely specified the basis on which it was acting. *See* note 7 *supra.* In the future, district judges should specify the particular nature of the contempt and the conditions, if any, attached to sentence, including the statutory authority upon which the contempt is predicated, in order that situations such as the one presented on this appeal can be avoided.

### IV.

We conclude that the six-month sentence imposed on Eyler was imposed for a criminal contempt. Therefore, we will affirm the August 21, 1979 order of the district court which denied Eyler's motion to modify his sentence.

SEITZ, Chief Judge, dissenting.

In determining the nature of the contempt sentence imposed on the appellant, Eyler, the majority regards as controlling its construction of the district court's "intention." In my view, the court's intention is irrelevant until we determine that appellant received timely notice that he was charged with a criminal offense. This notice is fundamental in our system of criminal justice. *See United States v. United*

*Mine Workers,* 330 U.S. 258, 295–98, 67 S.Ct. 677, 696–98, 91 L.Ed. 884 (1947).

These proceedings were summary; no written charges were filed. Consequently, we must rely on the record of the hearings to determine whether appellant had fair notice. Certainly no document or statement by either the government or the district court explicitly informed him prior to his conviction that he was charged with criminal contempt.

Assuming that the proceedings themselves can provide sufficient notice, can we say that these proceedings put the appellant on notice? The quotations from the record contained in the majority opinion and, indeed, the majority opinion itself demonstrate that neither the district court nor the government focused on the criminal nature of the contempt proceedings.[1] Obviously, then, their actions could not inform appellant in that regard. I do not think that one should be charged with notice of a criminal charge on such an ambiguous record.

Furthermore, even though civil and criminal charges may be tried together, *United States v. United Mine Workers, supra* at 299, 67 S.Ct. at 698, such a proceeding does create real risks that a defendant's rights on the criminal charge may be lost or obscured. Here, even if we postulate fair notice of the criminal charge, appellant was prejudiced substantially by the district court's failure to give him his right of allocution on the charge. *Taylor v. Hayes,* 418 U.S. 488, 498, 94 S.Ct. 2697, 2703, 41 L.Ed.2d 877 (1974). Notwithstanding the contrary statement of appellant's attorney at oral argument, the record makes plain that the court did not address the appellant person-

---

1. The record does not show that the district court conformed strictly to the procedural requirements of either type of contempt. Rather, the court proceeded with indiscriminate references to the requirements of both. The majority notes that the court, in compliance with rules applicable only to criminal proceedings, limited the sentence to six months. The district court also stated that appellant's refusal to testify could lead to imprisonment for up to 18 months, a limitation applied only to civil contempt. 28 U.S.C. § 1826(a) (1976). The court provided that appellant's contempt sentence would interrupt the running of his prior criminal sentence, a feature of civil contempt. Finally, the court complied with the most critical feature of civil contempt: it gave appellant an opportunity to purge himself of the sentence. *See Shillitani v. United States,* 384 U.S. 364, 370–72, 86 S.Ct. 1531, 1536, 16 L.Ed.2d 622 (1966). While I choose not to contest the majority's conclusion that the indicia of criminal contempt predominate, the foregoing persuades me that the district court itself determined that its proceeding was criminal in nature only after the fact.

ally and in the manner required by Fed.R. Crim.P. 32(a).

Nor is the right of allocution an empty ritual in this type of summary criminal contempt. A contemner may be able to persuade the sentencing judge to consider, when determining the length of sentence, such mitigating factors as the danger to him or his family were he to testify. Such considerations would be irrelevant in formulating the terms of a civil contempt order.

Given the considerations that I have mentioned, I believe the doubt should be resolved against treating these contempt proceedings as criminal. The construction that I place on the order would place no double jeopardy bar to a subsequent criminal contempt proceeding against appellant. I would therefore remand the case to the district court to modify its order.

HIGGINBOTHAM, J., joins in this dissenting opinion.

ALDISERT, Circuit Judge, dissenting.

I dissent from the court's holding that appellant may be convicted of a criminal offense without notice of a criminal charge, and at the same time that a new criminal sentence may interrupt for half a year the running of a four year sentence that appellant had begun serving some eight and one-half months earlier. I thus agree with Chief Judge Seitz that without notice appellant's contempt proceedings may not be considered criminal in nature. Moreover, I do not approve of the practice of permitting a contempt sentence to interrupt the running of a current criminal sentence under *any* circumstances, whether the contempt is civil or criminal. In a case of criminal contempt, such as the majority finds here, interruption of a current criminal term,

rather than imposition of a concurrent or consecutive criminal sentence, is unwarranted and unprecedented.

I have previously expressed my disapproval of the sandwiching of a contempt sentence in the midst of the service of a criminal sentence. *In re Grand Jury Investigation (Hartzell)*, 542 F.2d 166, 169 (Aldisert, J., concurring and dissenting), *rehearing denied*, 542 F.2d 173, 174 (3d Cir. 1976) (Aldisert, J., opinion sur denial of petition for rehearing), *cert. denied*, 429 U.S. 1047, 97 S.Ct. 755, 50 L.Ed.2d 762 (1977). I reaffirm my view that a district court lacks jurisdiction so to alter a criminal sentence. *See* Rule 35, Federal Rules of Criminal Procedure [1] and my opinions in *Hartzell*. Rule 35 clearly limits the power of a district court to touch a criminal sentence after 120 days. In this case appellant, after pleading guilty, was sentenced on November 8, 1978. After 120 days, or after March 8, 1979, the district court no longer had jurisdiction to modify that sentence. The district court proceeded, however, to suspend the running of the sentence on July 13, 1979, for a term of six months. For the reasons expressed in my dissenting opinions in *Hartzell*, I would reverse the order of the district court.

Since *Hartzell* my position has been strengthened by the opinion of the Supreme Court in *United States v. Addonizio*, 442 U.S. 178, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979). In that case the Court said:

[O]nce a sentence has been imposed, the trial judge's authority to modify it is . . . circumscribed. Federal Rule Crim.Proc. 35 now authorizes District Courts to reduce a sentence within 120 days after it is imposed or after it has been affirmed on appeal. *The time peri-*

---

1. Fed.R.Crim.P. 35(b), effective Aug. 1, 1979, provides:

   Reduction of Sentence.—The court may reduce a sentence within 120 days after the sentence is imposed, or within 120 days after receipt by the court of a mandate issued upon affirmance of the judgment or dismissal of the appeal, or within 120 days after entry of any order or judgment of the Supreme

   Court denying review of, or having the effect of upholding, a judgment of conviction. The court may also reduce a sentence upon revocation of probation as provided by law. Changing a sentence from a sentence of incarceration to a grant of probation shall constitute a permissible reduction of sentence under this subdivision.

od, however, *is jurisdictional and may not be extended.*

442 U.S. at 189, 99 S.Ct. at 2242 (emphasis added). *See* Fed.R.Crim.P. 45(b); *United States v. Robinson,* 361 U.S. 220, 80 S.Ct. 282, 4 L.Ed.2d 259 (1960). Footnote sixteen of *Addonizio* noted:

> Prior to the adoption of Rule 35, the trial courts had no such authority. "The beginning of the service of the sentence in a criminal case ends the power of the court even in the same term to change it." *United States v. Murray,* 275 U.S. 347, 358 [48 S.Ct. 146, 149, 72 L.Ed. 309]. This rule was applied even though the change related only to the second of a pair of consecutive sentences which itself was not being served at the time. *Affronti v. United States,* 350 U.S. 79, 76 S.Ct. 171, 100 L.Ed. 62.

442 U.S. at 189 n. 16, 99 S.Ct. at 2242 n. 16. Because the issue turns on a question of jurisdiction, it comes to this: if a defendant may not invoke the jurisdiction of a court to *reduce* his sentence after 120 days, *a fortiori,* the government may not invoke that same jurisdiction to *increase* or interrupt that sentence, directly or indirectly, by sandwiching into it a new term of criminal contempt.

I recognize that I stand in a minority,[2] but I believe, in light of Rule 35(b) and *Addonizio,* that the cases that have approved the interruption of criminal sentences have been wrongly decided.

Accordingly, I would reverse the order of the district court.

---

2. Eight courts of appeals, including ours, permit sandwiching of contempt sentences. *United States v. Dien,* 598 F.2d 743 (2d Cir. 1979); *In re Grand Jury Investigation (Hartzell),* 542 F.2d 166 (3d Cir. 1976), *cert. denied,* 429 U.S. 1047, 97 S.Ct. 755, 50 L.Ed.2d 762 (1977); *In re Grand Jury Proceedings (Marshall),* 532 F.2d 410 (5th Cir.), *cert. denied,* 429 U.S. 924, 97 S.Ct. 354, 50 L.Ed.2d 309 (1976); *Williamson v. Saxbe,* 513 F.2d 1309 (6th Cir. 1975); *Anglin v. Johnston,* 504 F.2d 1165 (7th Cir. 1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1353, 43 L.Ed.2d 440 (1975); *Martin v. United States,* 517 F.2d 906 (8th Cir.), *cert. denied,* 423 U.S. 856, 96 S.Ct. 105, 46 L.Ed.2d 81 (1975); *In re Garmon,* 572 F.2d 1373 (9th Cir. 1978); *United States v. Liddy,* 510 F.2d 669 (D.C.Cir. 1974), *cert. denied,* 420 U.S. 980, 95 S.Ct. 1408, 43 L.Ed.2d 661 (1975). *See also United States v. Wilson,* 421 U.S. 309, 320, 95 S.Ct. 1802, 1808, 44 L.Ed.2d 186 (1975) (Blackmun, J., joined by Rehnquist, J., concurring). In *Wilson* Justice Blackmun noted in dictum that "despite the fact that respondents were already incarcerated for substantive criminal offenses, it appears to be clear that service of their sentences could have been interrupted to compel them to serve an intervening sentence for contempt." *Id.* at 321 n. 2, 95 S.Ct. at 1809 n. 2.